# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

CHRISTINA PIERSON,                        :

    Plaintiff,                          :

                                 Case No. 3:13cv00319

vs.                                       :

                                 District Judge Walter Herbert Rice

CAROLYN COLVIN,                           :       Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                  :

    Defendant.                          :

# REPORT AND RECOMMENDATIONS[1]

## I.    __Introduction__

In September 2004, Plaintiff Christina Pierson applied for Disability Insurance Benefits and Supplemental Security Income.  Melvin A. Padilla, an Administrative Law Judge (ALJ) of the Social Security Administration, denied Pierson's applications on the ground that she was not under a benefits-qualifying disability.  Upon review in this Court, District Judge Rice concluded that substantial evidence did not support ALJ Padilla's decision.  Judge Rice consequently vacated the ALJ's decision and remanded the matter to the Social Security Administration for further proceedings.

On remand, ALJ Amelia G. Lombardo held a hearing and issued a decision finding

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

that Pierson was not under a benefits-qualifying disability.  Pierson brings the present

case challenging ALJ Lombardo's non-disability decision.  The case is before the Court

upon Pierson's Statement of Errors (Doc. #11), the Commissioner's Memorandum in

Opposition (Doc. #14), the administrative record, and the record as a whole.

Pierson, through her counsel, raises the following alleged errors:

- ALJ Lombardo Erred In Her Evaluation at Step 3 Of The Sequential Evaluation, Erroneously Relying On Her Own Lay Opinion, Rather Than The Opinion Of The Treating Psychiatrist;

- ALJ Lombardo's Opinion Concerning Plaintiff's Residual Functional Capacity Is Not Supported By Substantial Evidence;

- ALJ Lombardo Failed To Properly Consider Plaintiff's Credibility.

(Doc. #11, PageID at 74, 76, 80).

The Commissioner asserts that substantial evidence supports ALJ Lombardo's

evaluation of the medical sources' opinions as well as Pierson's credibility.

## II.    Pierson's Background and Medical Records

Pierson is considered to be a younger person for Social Security purposes because

she was 21 years old in August 11, 2002, the date she asserts her benefits-qualifying

disability began.  *See* 20 C.F.R. §§ 404.1563(c); 416.963(c).[2]  She has a high school

education and attended a Cosmetology School.  Her past work as a telemarketer is

characterized as "semiskilled," under Social Security Regulations.  *See* 20 C.F.R.

_____

[2] The remaining citations focus on the Regulations applicable to Disability Insurance Benefits. The citations incorporate the Regulations corresponding to Supplemental Security Insurance, without separately identifying them.

§404.1568(b).

The administrative record contains many medical records plus opinions by various medical sources including, but not limited to, Pierson's treating psychiatrist Dr. Gollamudi, her treating physician Dr. Mullinex, and medical expert Dr. Buban, who testified during ALJ Padilla's administrative hearing. A detailed description of Pierson's medical records and the medical source opinions is unnecessary because the undersigned has reviewed the entire administrative record and because both the ALJ and Pierson's counsel have accurately summarized the relevant records concerning Pierson's physical and mental impairments with citations to specific evidence. The Commissioner likewise discusses the relevant facts.

III.  **"Disability" Defined, Remand,
       and ALJ Lombardo's Decision**

To be eligible for DIB or SSI a claimant must be under a "disability" as the term is defined in the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70.

When Judge Rice issued his decision remanding this matter to the Social Security

Administration, he set forth the following non-exclusive observations:

a.  Apparently, the Administrative Law Judge [Padilla] relied primarily on the testimony of the Medical Advisor.  Yet, that Medical Advisor, Dr. Buban, relied upon the wrong standard in opining that Plaintiff did not meet the relevant Listing.

b.  The Administrative Law Judge failed to give sufficient reasons for discounting or ignoring the testimony of treating psychiatrist Dr. Gollamudi with regard to Plaintiff meeting the relevant Listing.

c.  The Administrative Law Judge, while failing to give the treating physician's opinion controlling weight, failed to weigh the testimony of that medical professional in determining what weight should be given that opinion, under the factors set forth in the Commissioner's Regulations.  While the Magistrate Judge's analysis was on the basis of whether the opinion of non-disability was supported by substantial evidence, this analysis fails where there is a failure to follow the Defendant's own legal criteria, to wit: failure to following the procedure requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions.

(Doc. #13, PageID at 756-57).

As noted previously, it fell to ALJ Lombardo on remand to re-evaluate the evidence connected to Pierson's applications for DIB and SSI.  ALJ Lombardo did so by considering each of the 5 sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. §404.1520(a)(4), 416.920(a)(4).[3]  Although she reached significant conclusions at each sequential step, her more pertinent findings occurred at Steps 2, 3, and 4.

At step 2, ALJ Lombardo found that Pierson "has the following severe impairments: bipolar disorder and headaches probably due to medication overuse.  As of April 16, 2008,

---

[3] The remaining citations to the Regulations will identify the pertinent DIB Regulation with full knowledge of the corresponding SSI Regulation.

[Pierson] has additional severe impairments of fibromyalgia; degenerative disk disease of the thoracic spine; and degenerative disk disease of the lumbosacral spine."  (PageID at 740).

The ALJ concluded at step 3 that Plaintiff did not have a mental or physical impairment, or combination of her impairments, that met or equaled the criteria in the Social Security Regulation's Listing of Impairments.[4]  (PageID at 745).

At step 4, the ALJ concluded that Pierson had the residual functional capacity[5] to perform light work, *id*., meaning she could lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...."  20 C.F.R. §404.1567(b).  The ALJ further found that Pierson was limited to unskilled work and "low stress work, which in this case is defined as no assembly line production quotas, no fast-paced work, no contact with the general public, and only occasional contact with supervisors or co-workers."  (PageID at 746).

ALJ Lombardo also concluded at step 4 that Pierson lacked credibility as to her "allegations and subjective complaints."  (PageID at 750).

## IV.  **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ

---

[4] The Listings appear in the Regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1.

[5] "Residual functional capacity" is an assessment of the most a person can do in a work setting despite his or her limitations.  20 C.F.R. §404.1545(a); *see Howard v. Comm of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting, in part, *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.

6

2004)).

## V.  <u>Discussion</u>

### A.  <u>The Parties' Contentions</u>

Pierson challenges the ALJ's decision to discount or reject her treating psychiatrist,

Dr. Gollamudi's opinions at steps 3 and 4 of the sequential evaluation.  Pierson contends

that at step 3, the ALJ erred by relying on medical expert Dr. Buban's opinion that she did

not meet or equal an impairment in the Listings.  Pierson also contends that the ALJ erred

by overlooking Dr. Gollamudi's opinions at Step 3 and by relying on her own lay opinion

to conclude that Pierson did not meet or equal Listing 12.04.  Pierson further argues that at

step 4, substantial evidence does not support the ALJ's evaluation of Dr. Gollamudi's

opinion.  And Pierson maintains that the ALJ's analysis of her treating physician Dr.

Mullinex's opinions was seriously flawed in part because Dr. Mullinex's treatment notes

supported her opinions.

The Commissioner reads ALJ Lombardo's decision quite differently.  The

Commissioner maintains that the ALJ properly weighed the medical source opinions by

crediting the state agency reviewing doctors and by discounting the disability opinions of

Drs. Gollamudi and Mullinex.  The Commissioner reasons that the disability opinions of

Drs. Gollamudi and Mullinex opinion reached a legal conclusion within the ALJ's sole

province to determine.  The Commissioner further reasons that the ALJ provided good

reasons for discounting the opinions of Drs. Gollamudi and Mullinex.  And, according to

7

the Commissioner, the ALJ did not rely on Dr. Buban's opinion but merely noted that Dr.

Buban had found Pierson's mental impairments "not of listing level severity."  (Doc. #14,

PageID at 96) (citing Tr. (PageID) at 745).

### B.    Medical Source Opinions

Social security regulations recognize several different types of medical sources:

treating physicians and psychologist, nontreating yet examining physicians and

psychologists, and nontreating/record-reviewing physicians and psychologists.  *Gayheart*

*v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing, in part, 20 C.F.R. §§ 404.1527(c)(1) and (2) (eff. April

1, 2012)).[6]  To effect this hierarchy, the Regulations include the treating physician rule.

*See Gayheart*, 710 F.3d at 375; *see also Rogers*, 486 F.3d at 242; *cf. Bauer v. Astrue*, 532

F.3d 606, 608 (7th Cir. 2008) ("in fact the technical name for the 'treating physician' rule

---

[6] The Social Security Administration has relettered 20 C.F.R. §404.1527 without altering the treating physician rule or other legal standards. *See Gentry v. Comm'r of Social Sec.*, 741 F.3d 708, 723 (6th Cir. 2013).  The relettered version applies to decisions, like ALJ Flottman's decision, issued on or after April 1, 2012.

is the 'treating source' rule").  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with other substantial evidence in [a claimant's] case record."

*Gayheart*, 710 F.3d  at 376 (quoting 20 C.F.R. §404.1527(c)(2)); *see Gentry v. Comm'r of Social Sec.*, 741 F.3d 708, 723 (6th Cir. 2014).  If both conditions do not exist, the ALJ's review must continue:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Rogers*, 486 F.3d at 242 (citing *Wilson v. Comm'r of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

The Regulations also require ALJs to "always give good reasons ... for the weight [they] give your [a claimant's] treating source's opinion." 20 C.F.R. §404.1527(c)(2).  Social Security Ruling 96-2p, 1996 WL 374188 (July 2, 1996) echoes this mandate and further explains that an ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in ths case record, and must be sufficiently specific to make clear to any subsequent reviews the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*., 1996 WL at *5.  The good-reasons requirement is "a mandatory procedural protection

....." *Wilson*, 378 F.3d at 546.

### C.    Dr. Gollamudi's Opinions

Treating psychiatrist Dr. Gollamudi and counselor Ms. Schultz began treating Pierson in October 2004.  (PageID at 472).  In May 2005, Dr. Gollamudi diagnosed Pierson with bipolar disorder I, mixed, severe with psychotic symptoms.  (PageID at 473).  He noted that due to this bipolar disorder, Pierson was moderately to markedly limited in her ability to remember, understand and follow directions; extremely limited in her ability to maintain attention; and markedly limited in her ability to sustain concentration and persist at tasks.  (PageID at 473).  Dr. Gollamudi noted that Pierson was not capable of functioning appropriately in social situations and had "poor adaptation to changes in her environment."  *Id*.  And, according to Dr. Gollamudi, Pierson would react to work pressures with irritability and aggressiveness or "would become tearful and unable to function at the slightest pressure to do more or better."  (PageID at 472-473).

Pierson continued to see Dr. Gollamudi and counselor Ms. Schulz in 2005, 2006, and the early months of 2007.  In April 2007, Dr. Gollamudi opined that she had poor or no ability to interact with supervisors, deal with work stress, function independently, maintain attention/concentration.  She also had poor or no ability to understand, remember, and carry out complex job instructions.  (PageID at 620).  Dr. Gollamudi found that Pierson had only a fair ability to perform most of the other mental demands of work.  (PageID at 619-21).

10

The ALJ discounted Dr. Gollamudi's opinions by finding them inconsistent with his own treatment notes and by observing that the treatment notes consistently showed normal mental status exams.  (PageID at 747).  Substantial evidence does not support these reasons.  Mental status exams frequently revealed abnormal findings.  Her mood was depressed, her speech was rapid and pressured, her flow of thought was rapid, she had flight of ideas, and her affect was irritable and tearful.  (PageID at 500-14, 518-20).  She also experienced perceptual abnormalities such as seeing shadows, bugs, and bruises on her arms that were not there.  (PageID at 478, 500).  Although there were times when such abnormalities were not evident and Pierson experienced improved symptoms, the ALJ's reliance on these as a reason to discount Dr. Gollamudi's opinions points toward a misunderstanding of the fluctuating symptoms typically presented by a person suffering from bipolar disorder.

> People with bipolar disorder experience unusually intense emotional states that occur in distinct periods called "mood episodes."  Each mood episode represents a drastic change from a person's usual mood and behavior. An overly joyful or overexcited state is called a manic episode, and an extremely sad or hopeless state is called a depressive episode. Sometimes, a mood episode includes symptoms of both mania and depression. This is called a mixed state.  People with bipolar disorder also may be explosive and irritable during a mood episode.

> * * *

> Bipolar disorder usually lasts a lifetime.  Episodes of mania and depression typically come back over time.  Between episodes, many people with bipolar disorder are free of symptoms, but some people may have lingering symptoms.

11

http://www.nimh.nih.gov (search for "bipolar disorder signs symptoms").

As the Seventh Circuit Court of Appeals has explained in a social security case involving plaintiff with bipolar disorder:

> A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job. That is likely to be the situation of a person who has bipolar disorder that responds erratically to treatment. Ronald C. Kessler et al., "The Prevalence and Effects of Mood Disorders on Work Performance in a Nationally Representative Sample of U.S. Workers," 163 *Am. J. Psychiatry* 1561–68 (2006). That is another point that the administrative law judge overlooked.

*Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (other internal citations omitted).

ALJ Lombardo, like the ALJ in *Bauer*, improperly concentrated on the occasions of Pierson's improved symptoms as a basis for discounting Dr. Gollamudi's opinions about the work limitations caused by bipolar disorder. ALJ Lombardo did not explain how these improved symptoms failed to support Dr. Gollamudi's opinions when the improved symptoms – or even asymptomatic periods – would be expected, given her extensive treatment with prescription medications and her diagnosis of bipolar disorder I mixed, severe with psychotic symptoms. *See id*.; *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 382-83, 390, 861 (296.64: Bipolar Disorder ... Mixed, Severe With Psychotic Features). ALJ Lombardo's reasoning, moreover, is circular. It relies on a typical feature of bipolar disorder – periods of symptom remission or improvement – as a basis for discounting Dr. Gollamudi's opinions and minimizing the

12

severity of Pierson's bipolar disorder. Yet, periods of remission or symptom improvement are to be expected in a person suffering from bipolar disorder. "The condition [bipolar disorder], which varies in its severity, is treatable by antipsychotic drugs and other medications. But many patients do not respond well to treatment, or have frequent relapses." *Bauer*, 532 F.3d at 607 (internal citations omitted).

Substantial evidence likewise fails to support ALJ Lombardo's other reasons for discounting Dr. Gollamudi's opinions. ALJ Lombardo observed, "The claimant was seen only by her therapist and psychiatrist every month or so, which is indicative of maintenance, rather than treatment of a mental impairment causing significant symptoms." (PageID at 747). Reading this in the context of the ALJ's decision to discount Dr. Gollamudi's opinions, the ALJ used the term "maintenance" to mean, "maintenance of a mental impairment without significant symptoms." This, however, again suggests that the ALJ misunderstood the varying symptoms inherent with bipolar disorder and overlooked or ignored the presence of Pierson's varying symptoms in Dr. Gollamudi records.

ALJ Lombardo also considered Plaintiff's testimony about her daily activities to discount Dr. Gollamudi's opinions. The ALJ wrote:

> There has been no exacerbation of symptoms requiring inpatient hospitalization. His conclusions are also inconsistent with the claimant's wide range of activities of daily living: she testified that she has a license and drives, got her children off to school, cooked dinner, did housework with periods of resting, did the laundry, shopped alone, visited her parents, attended parent-teacher conferences, took her children to doctor appointments, and spent four to five hours a night with them.

13

(PageID at 747).  In *Bauer*, a similarly limited-level of daily activities did not support the

ALJ's rejection of treating medical sources' opinions:

> Many of the reasons offered by the administrative law judge for
> discounting the evidence of Drs. Caspary and Chucka suggest a lack of
> acquaintance with bipolar disorder.  For example, the judge noted that the
> plaintiff dresses appropriately, shops for food, prepares meals and performs
> other household chores, is an "active participator [sic ] in group therapy," is
> "independent in her personal hygiene," and takes care of her 13-year-old son.
> This is just to say that the plaintiff is not a raving maniac who needs to be
> locked up.  She is heavily medicated, and this enables her to cope with the
> challenges of daily living, and would doubtless enable her to work on some
> days.  But the administrative law judge disregarded uncontradicted evidence
> that the plaintiff's son cooks most meals, washes the dishes, does the
> laundry, and helps with the grocery shopping....

*Bauer*, 532 F.3d at 608.  As in *Bauer*, Pierson's testimony revealed her to be much more

limited in her daily activities than the ALJ recognized.  She testified that she has little

social interactions, only goes to the grocery store at night, and has erratic sleep.  Some days

she sleeps ten hours a day and some days only two to three hours a day.  (PageID at 710).

She cooks only "[s]mall dinners."  (PageID at 713).  Her mother helps her mop.  Pierson

attempts to do housework but does one thing then needs to rest.  (PageID at 1187).

Pierson testified that she has always had help caring for her children, either from her

mother or her boyfriend.  (PageID at 716-17, 1190).  Rather than attending her children's

school activities, she attends parent-teacher conferences only twice a school year.  (PageID

at 717, 1185).  She always requires some type of daily assistance.  (PageID at 1184, 1192).

She testified that she has mood swings; anger outbursts; does not like people; spends

money at times and does not realize it; confuses easily; and cries all the time; and has

14

suicidal thoughts three or four times per year (her counselor has helped her through them). (PageID at 707-07).  She visits her parent "[o]nce in a great while."  (PageID at 1185). She has hyper-episodes every other month that last about a week.  (PageID at 708).

Accordingly, Pierson's challenges to the ALJ's evaluation of Dr. Gollamudi's opinions are well taken.

### D.    Dr. Mullinex

Dr. Mullinex was Pierson's treating physician.  In February 2006, Dr. Mullinex wrote a letter documenting Pierson's diagnoses as chronic migraine headaches, thoracic and lumbar pain, and bipolar disorder.  (PageID at 353).  Dr. Mullinex explained, in part:

> She has been [m]y patient since 10-30-2002.  Prior to this she had a prolonged history of migraines, chronic lumbar pain and depression.
>
> Staring in 11-2003, Ms. Pierson has had severe escalation in the severity of her migraines.  She was trialed on numerous preventive and acute migraine medications without success.  She reported severe migraines 4-6 days per month during the remainder of 2003.  Staring in 2004 she began to have intractable migraines with severe nausea, vomiting, and phonophobia. These were incapacitating.
>
> She has also had escalating mood symptoms with suicide attempt/ideation [o]n September 20, 2004.  She is currently under psychiatric care for a diagnosis of bipolar disorder.
>
> Ms. Pierson also has chronic thoracic and lumbar pain....  She was referred for chronic pain management in July, 2005 and currently only obtains relief with numerous medications including muscle relaxants and prescription narcotics.
>
> It is my professional opinion that secondary to Ms. Pierson's multiple medical problems she has been unable to perform gainful employment since September, 2003 and is fully disabled.

15

(PageID at 353).

Dr. Mullenix continued as Pierson's treating family doctor. (PageID at 902-953, 1005-1165, 909, 914-15, 919, 949, 1007, 1013, 1018-20, 1032, 1036-39, 1045, 1047, 1057, 1059, 1061-62, 1066, 1087-89, 1097, 1108, 1119, 1159).

In January 2013, Dr. Mullenix completed a medical impairment questionnaire documenting her opinions about Pierson's Fibromyalgia. (PageID at 1167-69). Dr. Mullinex checked boxes indicating that Pierson had 12 out of 18 trigger points. She also noted that Pierson had the following signs and symptoms: fatigue, anxiety, depression, nervousness, headaches, muscle weakness, muscle pain, abdominal pain, and hair loss. And she indicated that Pierson suffered from severe pain and could not work one complete hour during an eight-hour work day. (PageID at 1169).

The ALJ gave "little weight" to Dr. Mullinex's opinions. (PageID at 747). The ALJ explained that Dr. Mullinex supported her disability opinion by giving "a nebulous response that [Pierson] was unable to work due to 'multiple medical problems.'" (PageID at 747 (quoting, in part, PageID 353)). Substantial evidence does not support this reading of Dr. Mullinex's February 2006 opinions. When her opinions are read as a whole, there is nothing nebulous about her report. *See* PageID at 353. The ALJ took the phrase "multiple medical problems" out of context and ignored or overlooked the detailed explanation Dr. Mullinex provided in the body of her report to support her opinions. *See id*. The ALJ failed to mention that Dr. Mullenix explained she has treated the Plaintiff since October 30,

16

2002.  Dr. Mullinex also pointed to the "severe escalation in the severity of [Pierson's]

migraines...," and that treatment of her migraines with "numerous preventive and acute

migraine medications" was unsuccessful.  *Id*.  Dr. Mullinex characterized Pierson's

migraines in 2004 as "intractable with severe nausea, vomiting, and phonophobia."

(PageID at 353).  And Dr. Mullinex noted Pierson's "escalating mood symptoms," her

ongoing treatment for bipolar disorder, and her "chronic thoracic and lumbar pain ..."  *Id*.

Dr. Mullinex's thus explained how these conditions affect Pierson, the treatment regimens

that have been tried, as well as the current treatment regimens.  Again, given all this, there

is nothing "nebulous" about Dr. Mullinex's report.  Additionally, Dr. Mullinex's own

treatment notes and other objective testing supports her opinion.  *See* PageID at 210,

287-290, 373, 394-400, 410-415, 529-542.

The ALJ incorrectly opines that Dr. Mullenix's notes regarding Pierson's mental

health, indicate "no apparent distress."  (PageID at 747).  However, such notes are to be

expected at times with a person suffering from bipolar disorder.  Without further

explanation, the ALJ's reference to such notes suggests a misunderstanding of Pierson's

bipolar disorder, rather than a valid reason for discounting Dr. Mullinex's opinions.  *See*

*Bauer*, 532 F3d at 609 (and citations therein).

Concerning fibromyaligia, the ALJ found no documentation of trigger points in Dr.

Mullinex's treatment notes, and the ALJ found it "of interest to note that the physician did

not perform any of the fibromyalgia exams herself."  (PageID at 747).  Even if a medical

17

assistant performed the fibromalygia examinations, this does not lessen the validity of Dr.

Mullinex's opinions because she signed off on the treatment notes at the time they were

written.  Doing so indicates that she did believed the trigger-point exam results were valid,

and she thus relied on them when exercising her professional medical judgment to treat

Pierson.  It is, moreover, likely that Dr. Mullenix performed her own triggered-point

examinations because she documented Pierson's 12 specific trigger points, including, for

instance, lower right and left cervical spine, right and left trapezious muscle, right and left

supraspinatis, and right and left second rib.  (PageID at 1168).

Lastly, the ALJ overlooked or ignored the many years of frequent treatment sessions

Pierson had with Dr. Mullinex – approximately 105 times (save 6-12 visits with her partner,

Dr. Loving).  *See* Doc. #11, PageID at 80.  It was a significant lapse, if not an error, for the

ALJ to reject Dr. Mullinex's opinions without addressing such frequent, long-term

treatment.  "Substantiality of the evidence must be based upon the record taken as a whole.

Substantial evidence is not simply some evidence, or even a great deal of evidence.  Rather,

the substantiality of evidence must take into account whatever in the record fairly detracts

from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 636, 641 (6th Cir. Aug. 6,

2013) (quoting, in part, *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir.1984)).

Accordingly, Pierson's challenges to the ALJ's evaluation of Dr. Mullinex's

opinions are well taken.

### E.    Step 3 and Dr. Buban

As noted above, one reason Judge Rice remanded this matter for further administrative proceedings was "that Medical Advisor, Dr. Buban, relied upon the wrong standard in opining that Plaintiff did not meet the relevant Listing."

Pierson is correct that on remand, ALJ Lombardo improperly relied on Dr. Buban's opinion at step 3 of the sequential evaluation.  Social Security ALJs are not free to ignore judicial Orders:

> In some Social Security cases, district courts will include detailed instructions concerning the scope of the remand and the issues to be addressed. In such cases, "[d]eviation from the court's remand order in subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson,* 490 U.S. 877, 886, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989).  *See also Mefford v. Gardner,* 383 F.2d 748, 758 (6th Cir. 1967) (noting "the general rule that, on the remand of a case after appeal, it is the duty of the lower court, or the agency from which appeal is taken, to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions."). These cases stand for the proposition that the administrative law judge may not do anything expressly or impliedly in contradiction to the district court's remand order.  These cases do not preclude the ALJ from acting in ways that go beyond, but are not inconsistent with, the district court's opinion....

*Hollins v. Massanari,* 49 Fed. App'x. 533, 536 (6th Cir. 2002).

ALJ Lombardo relied on Dr. Buban's opinion without providing any reason for doing so.  She did not weigh Dr. Buban's opinions under the legal criteria required by the Regulations, 20 C.F.R. §404.1527(d)(2)-(6); *see Gayheart*, 710 F.3d at 376, and she did not provide any reason for doing so when Judge Rice had found Dr. Buban's opinions to be based on incorrect legal criteria.  (PageID at 745, 767).

The Commissioner's contention that the ALJ did not err by merely noting Dr. Buban's testimony lacks merit.  Although the ALJ wrote – "it is noted" – with regard to Dr. Buban's testimony, the context of the ALJ's note reveals that she relied on Dr. Buban's opinion at step 3 as a reason for finding no listing-level impairment.  *See* PageID at 745.

Accordingly, Pierson's challenge to the ALJ's reliance on Dr. Buban's testimony at step 3 is well taken.[7]

## VI.    Reversal And Remand For Benefits

If the ALJ failed to apply the correct legal standards or her factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of  42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A reversal of the ALJ's decision and a judicial award of benefits are warranted in the present case because the evidence of disability is either overwhelming or strong while contrary evidence is weak, *see Faucher*, 17 F.3d at 176, and a remand for a third round of

---

[7] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's remaining challenges to the ALJ decision.

administrative proceedings serve no purpose other than delay.  The ALJ essentially ignored Dr. Gollamudi's and Dr. Mullinex's disability opinions at step 3, and the ALJ's evaluation of those long-term treating sources' opinions was flawed as set forth previously.  Out of the medical source opinions of record, the ALJ relied only on Dr. Buban's opinion at step 3.  This, as seen above, was error in light Judge Rice's remand decision and the incorrect legal criteria Dr. Buban applied.

Considering Pierson's medical records, including the credible and controlling findings and opinions of Drs. Gollamudi and Mullinex, as well as the objective medical evidence supporting the repeated differential diagnoses of migraine headaches, the evidence of disability is overwhelming or is, at a minimum, strong while contrary evidence is weak.  The evidence establishes that the opinions provided by Drs. Gollamudi and Mullinex are entitled to controlling weight under the treating physician rule. *See Blakely*, 581 F.3d at 406; *see also* 20 C.F.R. § 404.1520(d)(2).  Pierson's medical records establish that she suffers from a listing-level bipolar disorder, *see* 12.04, combined with frequent and severely painful and limiting migraines.  Consequently, Pierson's bi-polar disorder alone or in combination with the impact of her severe migraines qualifies her for benefits.

Accordingly, an Order remanding this case for benefits is warranted.  *See Faucher*, 17 F.3d at 176; *see also Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994).

### IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be vacated;

2.      Plaintiff Christina Pierson's applications for Disability Insurance Benefits filed on September 16, 2002 and September 15, 2004, and her application for Supplemental Security Income filed on September 15, 2004 be REMANDED to the Social Security Administration for payment of benefits consistent with the Social Security Act; and

3.      The case be terminated on the docket of the Court.


January 30, 2015                                    s/Sharon L. Ovington
                                            Sharon L. Ovington
                                   Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).